IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ANGELA GOODWIN, JOHNNY GILL,
NATHAN ROBINSON, EDDIE GUSBY,
PATRICIA CURRY, CAROLYN JONES,
For Themselves and on Behalf of All Other
Persons Similarly Situated                                          PLAINTIFFS


VS.                              CASE NO. 03-CV-1187


CONAGRA POULTRY COMPANY and
PILGRIM'S PRIDE, INCORPORATED                                  DEFENDANTS


**<u>MEMORANDUM OPINION</u>**

This is a case of alleged employment discrimination.  The six named plaintiffs in this

matter, all African-American, are current or former employees of Defendants, ConAgra Poultry

Company and/or Pilgrim's Pride, Incorporated.  They assert claims against the Defendants for

hostile work environment, disparate treatment and failure to promote under 42 U.S.C. §1981.

The matter is now before the Court on Plaintiffs' Motion for Class Certification.  (Doc. No. 172).

The Defendants have responded.  (Doc. Nos. 176-185).  The Court finds the matter ripe for

consideration.

<u>BACKGROUND</u>

On December 22, 2003, nine Plaintiffs, Angela Goodwin, Johnny Gill, Nathan Robinson,

Eddie Gusby, Patricia Curry, Carolyn Jones, Robert Nelson, Gloria Willis, and Gregory

Hamilton, filed this employment discrimination action against their current and/or former

employers, ConAgra Poultry Company and Pilgrim's Pride, Incorporated (herein referred to

collectively as the "Defendants").  (Doc. No. 1).  In the Complaint, the Plaintiffs alleged

employment discrimination based upon race and age.  The suit was filed on behalf of themselves

and as members of a putative class of African-American employees under 42 U.S.C. §1981, the

Arkansas Civil Rights Act of 1993 and 29 U.S.C. §623(a).  The Plaintiffs asserted claims for

failure to promote, racial harassment/hostile work environment, wrongful termination and

disparate treatment which allegedly occurred at the Defendants' chicken processing complex in

El Dorado, Arkansas.  They are seeking declaratory and injunctive relief, as well as

compensatory and punitive damages.

On October 13, 2004, Plaintiff Gloria Willis asked to be removed as a plaintiff in the

action.  (Doc. No. 24).  On November 3, 2004, the Court granted Willis' motion and she was

removed from the suit.[1]  (Doc. No. 26).  On February 23, 2005, Plaintiff Gregory Hamilton asked

to be removed as a plaintiff in the action and Plaintiff Robert Nelson asked the Court to dismiss

his age discrimination claim under 29 U.S.C. §623(a).  (Doc. No. 37).  On March 22, 2005, the

Court dismissed Nelson's age discrimination claim[2] and Hamilton was removed from the suit.[3]

---

[1] On November 4, 2004, Gloria Willis filed an individual action against Pilgrim's Pride alleging violations of Title VII of the Civil Rights Act of 1964.  Willis alleged that Pilgrim's Pride discriminated against her on the basis of her race, color, sex and religion when it terminated her in June 2004.  Case No. 04-CV-1106.  On July 27, 2006, the Court granted Pilgrim's Pride's Motion for Summary Judgment and dismissed Willis' claims with prejudice.  Willis did not assert a claim for racial harassment/hostile work environment in her individual lawsuit.

[2] Robert Nelson is the only plaintiff to assert an age discrimination claim against the Defendants.  Therefore, after March 22, 2005, the only claims remaining before the Court are for alleged race discrimination.

[3] On March 25, 2005, Gregory Hamilton filed an individual action against the Defendants alleging a violation of the American with Disabilities Act.  Case No. 04-CV-1035.  On February 7, 2007, the Court granted Defendants' Motion for Summary Judgment and

2

(Doc. Nos. 38 and 39).

Thereafter, the Defendants filed individual Motions for Summary Judgment against each of the seven remaining Plaintiffs.  (Doc. Nos. 40, 52, 75, 102, 105, 111 and 120).  On March 28, 2006, the Court granted summary judgment against individual Plaintiff Robert Nelson on the basis of judicial estoppel (Doc. No. 164), denied summary judgment as to Nathan Robinson's hostile work environment, disparate treatment and failure to promote claims (Doc. No. 158) and granted in part and denied in part summary judgment against Angela Goodwin, Carolyn Jones, Patricia Curry, Eddie Gusby and Johnny Gill.  (Doc. Nos. 156, 160, 161, 162, and 163).  The claims that remain before the Court are for hostile work environment brought by Goodwin, Jones, Curry, Gusby, Gill and Robinson, disparate treatment brought by Robinson and Gill and failure to promote brought by Robinson.

On May 5, 2006, the Plaintiffs filed the pending Motion for Class Certification.  (Doc. No. 172).  In this  motion, the Plaintiffs are only seeking class treatment of their §1981 claim for hostile work environment.[4]  The Defendants have responded to the motion.  (Doc. Nos. 176-185). On June 29, 2006, the parties came before the Court for oral arguments on the certification motion.

**Defendants' El Dorado Processing Complex**

For many years, Defendant ConAgra Poultry Company, a former subsidiary of ConAgra

---

dismissed Hamilton's ADA claim with prejudice.  Hamilton did not assert a claim for racial harassment/hostile work environment against the Defendants in his individual lawsuit.

[4] The Plaintiffs are not seeking certification of a class based on claims of disparate treatment or failure to promote.

3

Foods, Inc., owned and operated a chicken processing complex in El Dorado, Arkansas.  On or about November 24, 2003, Pilgrim's Pride, Incorporated purchased ConAgra Foods, Inc.'s poultry division, including ConAgra Poultry Company and its El Dorado processing complex.

The El Dorado complex consists of four campuses: 1) the processing plant campus, 2) the feed mills, 3) the hatchery and 4) live haul.  The processing plant campus, where the Plaintiffs work or formerly worked, consists of four areas: 1) the processing plant ("plant"), 2) the rendering facility ("rendering department"), 3) live haul shop and 4) the garage.  All four of these locations are in stand-alone buildings and are not connected to one another.

The plant is divided into different departments of operations.  The main departments are: 1) first processing, 2) second processing, 3) weight/price/labeling and 4) maintenance.  The plant also has a warehouse, a 28 degree room and a sanitation department.  There are two processing shifts within the plant—the day shift and the night shift. The employees and supervisory employees differ depending on the department and shift worked.

The rendering department has two departments of operations: 1) processing, and 2) maintenance.  There are three shifts within the rendering department—the day shift, the evening shift and the graveyard shift. The employees and supervisory employees differ depending on the department and shift worked.

At any given time, approximately 1,700 employees work at the plant.  Approximately eighty percent of these employees are African-American.  The plant is unionized and is represented by United Food and Commercial Workers, Local 2008.  Approximately sixty to seventy percent of the employees are members of the Union.

The complex has an anti-harassment policy.  This policy prohibits racial harassment

and/or discrimination at the plant and provides a reporting mechanism for employee complaints. There is also a confidential 1-800 hotline for employees to call and report any discrimination and/or harassment at the plant.  The  policy and hotline number are both posted on the plant's bulletin board and disseminated to employees during employee meetings and new employee orientation.  All of the Plaintiffs are aware of the anti-harassment policy and its reporting procedure.

### The Named Plaintiffs

There are six named Plaintiffs in this action.  They are all African-American and are either current or former employees of the Defendants.  They all work or have worked at the Defendants' El Dorado complex in different areas, in different departments, on different shifts and under different supervisory employees.  They all allege to have been subjected to a hostile work environment.  A summary of Plaintiffs' allegations follows.

#### *Plaintiff Angela Goodwin*

Angela Goodwin is African-American and a current employee of  Defendant Pilgrim's Pride.  She was hired in 1977 and has worked continuously at the complex for nearly thirty years. Goodwin is a member of the United Food and Commercial Workers, Local 2008 and worked as a walking steward for the Union from 1996 to 2000.  As a steward, Goodwin walked the plant helping to resolve employee complaints/problems and to ensure that the employees were being treated fairly pursuant to the Union's collective bargaining agreement.

In 2000, Goodwin was removed from the steward position.  Thereafter, she returned to her work in the plant and took the position of a knife sharpener in the deboning area in second processing.  Goodwin works on the day shift.  She has been supervised by Louis Welch, an

5

African-American, Lee Stewart, an African-American and Shelia Bagley, a Caucasian.

Goodwin alleges that she has been subjected to a hostile work environment at the plant. The focus of her allegation is her treatment at the hands of her Caucasian supervisor in second processing, Shelia Bagley.  Bagley was Goodwin's superintendent from late 2003 until December 2004 at which time Bagley was terminated.  Goodwin alleges that Bagley created a hostile work environment by assigning her additional duties outside her knife sharpening job, removing the stool from the knife sharpeners' room, thus, making her stand while she worked, refusing to let African-American employees off the line to attend baby showers and referring to African-American workers as "boys and gals," terms that Goodwin considered racist. Goodwin claims that when she complained about the discrimination her relationship with Bagley worsened.

Goodwin also alleges that in 1999, a notice was put up at the plant using the words "You folks," which she believed to be racist.  Goodwin alleges that the plant bathroom had racial graffiti on the stalls, but admits that the graffiti was not directed at her and was painted over by the Defendants.  Goodwin also admits that she never heard a supervisor use the "n" word or direct any type of racial slur or epithet towards her.  She also never witnessed any nooses at the plant.

### *Plaintiff Eddie Gusby*

Eddie Gusby is African-American and is currently employed by the Defendant Pilgrim's Pride.  He was hired in 1979 and cannot recall if he ever had a break in service.  From 1979 to 1993, Gusby worked in production.  In January 1993, Gusby accepted a position in the rendering department.  At the time of his transfer, Bill Devault, a Caucasian, was the supervisor over the entire rendering department.  Devault remained in this position until 2000.  Gusby believed that

6

Devault was always fair to him and he has no complaints regarding his treatment by Devault.  In 2000, Walter Cribb, a Caucasian, replaced Devault as the rendering department's supervisor.

Gusby presently works maintenance within the rendering department.  He works the evening shift from 3:00 p.m. to 11:00 p.m.  Kenny Jackson, an African-American, is Gusby's supervisor on the evening shift.  Gusby has no racial complaints against Jackson.  Randy Beaver, a Caucasian, is maintenance's day shift supervisor.  Gusby has very little contact with Beaver and cannot recall ever having any problems-–racial or otherwise–with him. Gusby is a member of the United Food and Commercial Workers, Local 2008.

Gusby alleges that he has been subjected to a hostile work environment at the plant.  In support of his allegation, Gusby states that, in 2002, Walter Cribb, the rendering department's Caucasian supervisor, started making maintenance employees perform production work, along with their maintenance duties, without being paid for the additional work.  He also claims that Cribb harassed him by never telling him he did a good job and by being "negative, negative, negative."  Gusby claims that Jerry Hunter, another Caucasian supervisor, "bogged him down on jobs."  Gusby also claims that he was told by another employee that Hunter said he wasn't going to hire any "n's" in maintenance and that Hunter was known to go down to the river and shoot at a target he called  "Eddie."  Gusby also states that he saw racial graffiti on the walls of the bathrooms in the rendering department and the plant, but admits that the graffiti was not directed at him personally and was painted over by the Defendants.  Gusby admits that he has never been called a racial slur at work or had any profanity directed at him.  He also never witnessed any nooses at the plant.

*Plaintiff Johnny Gill*

Johnny Gill is African-American and is currently an employee of Defendant Pilgrim's Pride.  He was hired in 1980 and has worked continuously in the rendering department since that time.  Bill Devault, a Caucasian, was the rendering department's supervisor and supervised Gill from 1980 until 2000.  Gill states that Devault maintained a "good environment" in the department and he believed that Devault was "the best."  He has no complaints regarding Devault's treatment of him.

From 1980 to 1996, Gill worked in the processing area of rendering where he operated a large storage cooker.  In 1996, Gill became a maintenance technician within the rendering department.  He currently works the evening shift from 3:00 p.m. to 11:00 p.m. with co-plaintiff Eddie Gusby.  Kenny Jackson, an African-American, is Gill's supervisor on the evening shift.  Randy Beaver, a Caucasian, has also been Gill's supervisor and Gill thought he was fair and "a pretty good man."  Gill is a member of the United Food and Commercial Workers, Local 2008.

Gill alleges that he has been subjected to a hostile work environment at the plant.[5]  In support of this allegation, Gill claims that Walter Cribb, the rendering department's Caucasian supervisor, started requiring maintenance employees to perform production work, in addition to their maintenance duties, without being paid for the additional work.  He claims that Cribb harassed him by not recognizing him for the good job he did and being negative about the maintenance work.  He claims that when the storage cooker broke down in 2003, Cribb said to

---

[5]  Gill also claims that he has been subjected to disparate treatment at the hands of the Defendants.  However, he is not seeking class certification of this claim.  Plaintiffs are only seeking class treatment of their claim for hostile work environment.  Therefore, the Court will not address Gill's disparate treatment claim in this opinion.

himself that "maintenance men need to be lined up and shot."  He also claims that during that

same year Cribb hollered at him one time but admits that Cribb did not use any racial slurs

during the incident.  Gill also claims that in 1987, he heard a Caucasian employee refer to an

American-American co-worker as a "big fat black bitch."  He claims that in 1998,  a Caucasian

maintenance man hollered "Jigaboo, Jigaboo" in his and another African-American employee's

direction. Gill does not know if the remark was directed at him or not.  He admits that there were

never any other racial slurs ever directed at him at the plant.  Gill also states that he heard talk

about  Jerry Hunter, a Caucasian supervisor, going to the river and shooting at a target he called

"Little Eddie," in reference to co-plaintiff Eddie Gusby.  Gill  claims that he saw racial graffiti on

the walls of the plant bathroom, but admits that the Defendants painted over the offensive writing

five or six times.  He also never witnessed any nooses at the plant.

### *Plaintiff Nathan Robinson*

Nathan Robinson is African-American and is currently an employee of Defendant

Pilgrim's Pride.  He was hired in 1980 and has worked continuously at the complex for over

twenty-five years.  For the first ten years of his employment, Robinson worked in the pre-pack

area in the processing plant.  In 1991, Robinson accepted a job in the feathers area of the

rendering department.  At that time, there were two Caucasian supervisors over this area, Bill

Devault and Randy Beaver.  In 1999, the feathers area was closed and Robinson was temporarily

moved to the 28 degree room.  Robinson was later transferred to the "Friskey's Room" where he

was a machine operator.  While in the "Friskey's Room," Robinson worked the graveyard shift.

During this time, the supervisory employees over Robinson were Kenny Jackson, an African-

American, Randy Beaver, a Caucasian, and Walter Cribb, a Caucasian.  In 2004, Robinson

became a forklift operator on the unloading dock in rendering.  He presently works the graveyard

shift from 8:45 p.m. to 5:15 a.m. During the first forty-five minutes of his shift, Robinson is

supervised by Willie Candyle, an African-American.  During the last fifteen minutes of his shift,

Robinson is supervised by Randy Beaver, a Caucasian.  There is no supervisor present for the

remainder of Robinson's shift.  He is a member of the United Food and Commercial Workers,

Local 2008.

     Robinson alleges that he has been subjected to a hostile work environment at the plant.[6]

In support of his allegation, Robinson alleges that his Caucasian supervisor, Randy Beaver, has

harassed him by "staying on" him all the time.  He also claims that Beaver failed to pay him

double time when he worked seven days in a row.  He claims that Walter Cribb, his Caucasian

superintendent,  blames him for mechanical breakdowns and takes his frustrations out on

African-American employees.  However, Robinson admits that neither Beaver nor Cribb ever

used any racial slurs toward him.  Robinson also claims that in the early 80's, while working in

production, Ken Hall, a Caucasian supervisor, treated him and other African-Americans

differently on breaks and would yell and holler at him.  He claims that from 1980-85, while

working in production, Buddy Wesson, a Caucasian supervisor, would not let him off work for

any reason.  He also claims that from 1990-91, while working in production, Granville Record

would yell at him, point his finger at him and call him "boy."  Robinson claims that in 1993, he

was called a "nigger" by a non-supervisory employee, that sometime before 2000, he was

---

[6] Robinson also claims that he has been subjected to disparate treatment and failure to promote at the hands of the Defendants.  However, he is not seeking class certification of these claims.  Plaintiffs are only seeking class treatment of their claim for hostile work environment.  Therefore, the Court will not address Robinson's disparate treatment or his failure to promote claim in this opinion.

walking by the break room and overheard some maintenance men use the "n" word and in 2000, he heard a Caucasian worker in the rendering department say that Jerry Hunter, a Caucasian supervisor, was working him like a "nigger."  Robinson claims that he saw racial graffiti on the walls of the plant bathroom and the rendering department bathroom, but admits that it is painted over every year.  Robinson admits that he was never called the "n" word or any other racial slur by a supervisory employee at the plant and that he never witnessed any nooses at the plant.

### *Plaintiff  Carolyn Jones*

Carolyn Jones is African-American and a former employee of Defendant ConAgra Poultry.  She was employed from October 1994, until she voluntarily quit because of medical problems in August 2003.

During her tenure at the complex, Jones worked primarily in the marination department in second processing.  Her supervisors included Buddy Wesson, a Caucasian, Willie Reedus, an African-American, and Kenneth Arrington, a Caucasian.  She was a member of the United Food and Commercial Workers, Local 2008.

Jones alleges that she was subjected to a hostile work environment at the plant.  In support of her allegation, Jones claims that one time she heard a Caucasian supervisor, Granville Record, refer to an employee as a "nigger" and that he would yell and curse at his subordinates. She also claims that another Caucasian supervisor, Sheila Bagley, told her to get back to where she came from, which Jones assumed meant Africa.[7]  However, Jones admits that the "n" word was never directed at her personally.

---

[7] Neither Record nor Bagley were Jones' supervisors at the time these remarks were made.

11

Jones claims that her Caucasian supervisor, Buddy Wesson, pushed her once and cursed at work and that Kevin Arrington, another one of her Caucasian supervisors, would curse and yell at work. Jones also claims that the plant bathroom had racial graffiti on the stalls.  Jones admits that she never heard any racial slurs from any of her supervisors and never saw any nooses at the plant.

### *Plaintiff Patricia Curry*

Patricia Curry is African-American and a former employee of Defendant ConAgra Poultry.  Curry worked at Defendants' plant on two separate occasions.  She first worked for the Defendant in the late 1970's for about a year.  In 1996, Curry returned to the plant and worked until October 2002, when she took a one-year medical leave of absence.  She was formally terminated in October 2003, at the end of her medical leave.

During her second tenure at the plant, Curry  worked in various departments and on different shifts.  In 1996, she started out on the "cone line" working on the day shift.  In 1997, Curry transferred to the boneless breast packout department and worked different positions on both the day shift and the night shift.  Then, in 2002, Curry transferred to the marination department where she worked the day shift.  Curry had different supervisors in each of the different departments and shifts she worked.  From 1996-1997, Curry was supervised by Kenneth Hall, a Caucasian.  From 1997-2000, Curry was supervised by Ann Simmons, another Caucasian. From 2000-2002, Curry was supervised by Jack Hill, an African-American; Vance Shepherd, an African-American; Michael Duckwork, an African-American; an African-American woman named Elonra; and Buddy Wesson, a Caucasian.  In October 2002, when Curry started her one-year medical leave, Buddy Wesson, a Caucasian, was her supervisor.   Curry was a member of

12

the United Food and Commercial Workers, Local 2008.

Curry alleges that she was subjected to a hostile work environment at the plant.  In support of her allegation, Curry claims that her Caucasian supervisors could have talked to her better.  She claims that Kenneth Hall, her Caucasian supervisor, used the word "Y'all," like he thought that they were living in slavery times. Curry also claims that Dawn Taylor, a Caucasian nurse, told her that she was having too many on the job injuries, was unprofessional in her treatment of her and on one occasion used profanity in her presence.  Curry also alleges that the plant bathroom had racial graffiti on the stalls but admits that the Defendants periodically painted the bathroom.  Curry admits that she was never called the "n" word or any other racial slur during her first or second tenure at the plant and never witnessed any nooses at the plant.

**The Proposed Class**

The named Plaintiffs in this case are asserting a plant-wide hostile work environment class action claim.  They seek to represent the following class:

> "African-American employees, including first line "supervisors" and lead persons, employed in the ConAgra Poultry-Pilgrim's Pride production complex in El Dorado at any time in the period from December 22, 1999 to the time of trial.
>
> Note:  [i] The term "supervisor" includes one category of workers in the production complex; it does not include all persons involved in supervision.  [ii] The proposed class excludes persons within the class as described, who have made claims as individuals for a racially hostile environment, which have been resolved or are pending."[8]

---

[8] Although the Plaintiffs' definition of the putative class does not so state, the Court understands that the class is comprised of those individuals who claim that they have been subjected to a racially hostile work environment while employed by ConAgra and/or

Plaintiffs allege that their claims arise from the same pattern and practice of racial discrimination experienced by the above described class members.  In support of their request for class certification, Plaintiffs present anecdotal evidence from various putative class members.[9]  A summary of their allegations follows.

### *Franklin Andrews*

Franklin Andrews is African-American and is a current employee of Defendant Pilgrim's Pride.  He has worked at the plant since 1999[10].  From 1999-2002, Andrews worked in the 28 degree room.  Ottis Green, an African-American, was his supervisor and a man named Bear was one of his superintendents.  Andrews had no trouble with either his supervisor or his superintendents while working in the 28 degree room.  In 2002, Andrews transferred to the wing line where he is currently working.  On the wing line, Andrews is a floor man and a CBC machine operator.  His supervisors have been Ottis Green, an African-American; Carolyn Jackson, an African-American; Lee Stewart, an African-American; and Raphael, a Hispanic.  His superintendents have been a man named Randy, an African-American and Shelia Bagley, a Caucasian.  He is a member of the United Food and Commercial Workers, Local 2008.

Andrews claims that he was subjected to a hostile work environment at the plant.  In support of his allegation, Andrews claims that on one occasion Randy from the HR department

---

Pilgrim's Pride.

[9] Class actions alleging a hostile environment are usually not susceptible to statistical analyses.  Therefore, while plaintiffs' ultimate burden remains the same, they generally must rely on anecdotal evidence and non-statistical experts. *See Carlson v. C.H. Robinson Worldwide, Inc.,* 2005 WL 758602, *6, n.8 (D.Minn. March 31, 2005).

[10] In the late 70's or early 80's, Andrews worked at Defendant's hatchery for a short time. He states that his work experience during this time was okay.

wanted to give him a written warning for leaving work. Andrews admits that he never received

the written warning. He also claims that on four or five occasions he heard Shelia Bagley call

African-American male employees "boy." This happened over a 1½-2 year period and she never

directed the term toward Andrews or abused him in anyway. He claims that on two or three

occasions, he heard a man named Randy call somebody "boy" but does not know who the term

was directed toward. Andrews also states that he heard talk about Granville Record and Walter

Cribb cussing and yelling at employees. He also heard talk about Granville Record throwing a

chicken at Willie White. Andrews states that he has seen racial graffiti on the walls in the plant

bathroom and in the elevator, but admits that the graffiti in these areas was painted over from

time to time. He also states that there is graffiti on a dumpster back by the by-products area that

has not been painted over. Andrews makes no mention of witnessing any nooses at the plant.

### *Judy Burris*

Judy Burris is African-American and is a current employee of the Defendant Pilgrim's

Pride. Burris was hired in 1981. For the first twenty years, Burris worked in the prepack

department. In 2002, Burris had surgery on both her hands for carpal tunnel syndrome. She was

placed on light duty and transferred to the supply room where she currently works. Anne

Simmons, a Caucasian, is her supervisor and Randy Hayes, an African American, is her

superintendent. She has no complaints regarding these two individuals. Burris is a member of

the United Food and Commercial Workers, Local 2008.

Burris claims that she was subjected to a hostile work environment during the time she

worked in the prepack department. In support of her allegation, Burris claims that after she was

injured, Shelia Bagley, her Caucasian supervisor, looked at her medical records and put her to

work picking feathers even though she had been placed on light duty.  She claims that Bagley did

not do this to a Caucasian employee.  Burris also claims that she had to wait several weeks to go

to the doctor while a Caucasian employee only had to wait a couple of days to see the doctor.

She claims that Shelia Bagley would say "you people" to African-American employees and refer

to African-American men as "boys."  She states that she heard Bagley use these terms four times

in a two year period.  Burris also claims that the plant bathroom was filthy and in disrepair while

the bathroom in the personnel office was clean and in good working condition.  She states that in

2001, she was told that she could not use this bathroom because it was for the use of employees

in the personnel office and for drug testing.  Burris admits that both African-Americans and

Caucasians worked in the personnel office. Burris claims that during a bomb threat only the

cookhouse was evacuated while the plant continued to work.  She admits both African-

Americans and Caucasians were in each group.  She also claims that during a tornado warning

only certain areas of the plant were evacuated while other areas had to remain at work.  Burris

admits that African-Americans and Caucasians were in both areas–those that were evacuated and

those that continued working.  Burris also claims that during inclement weather, such as ice

storms, African-American employees are picked up and required to come to work while

Caucasian employees are not.   Burris admits that she was never cursed at by a Caucasian

supervisor or superintendent.  Burris does not claim to have seen any racial graffiti in the plant

bathroom and makes no mention of witnessing any nooses at the plant.

### *Doris Ellison*

Doris Ellison is African-American and is a current employee of Defendant Pilgrim's

Pride.  Ellison was hired in 1990 in the prepack department.  While in the prepack department,

one of Ellison's supervisors was Shelia Bagley, a Caucasian.  In 2002, Ellison transferred to the evisceration department. She is presently not a member of the United Food and Commercial Workers, Local 2008.

Ellison claims that she was subjected to a hostile work environment while working in the prepack department.  In support of her allegation, Ellison claims that her Caucasian supervisor, Shelia Bagley, would talk rude to her and, in 2001, she told Ellison to shut up.  Ellison also states that she saw Granville Record, a Caucasian supervisor, curse and yell at the rack pushers in his department and that she heard talk in the plant that Record threw a chicken at Willie White. Ellison also states that she heard talk in the plant that there was racist graffiti in the maintenance department bathroom, that Charlie Jackson grabbed Tasha Moore's arm and that African-Americans were not given the opportunity to work in the maintenance department.  Ellison claims that the plant bathroom was filthy and in disrepair while the bathroom in the HR office was clean and in good working condition.

### *Rodney Henry*

Rodney Henry is African-American and is a current employee of Defendant Pilgrim's Pride.  Henry was hired in 1976.  In 1979, Henry became a supervisor in the prepack department. While in the prepack, Granville Record, a Caucasian, was Henry's superintendent.  Then, in 2000, Henry became a supervisor in the 28 degree room.  While in this area, Shelia Bagley, a Caucasian, was the superintendent on nights.  In November 2002, Henry transferred to the rendering department, where he presently works.

Henry claims that he was subjected to a hostile work environment while working at the plant.  In support of his allegation, Henry claims that while working in prepack, Granville Record

17

would curse and yell at the African-American employees.  He claims that he overheard Record use the word "boy" among a bunch of supervisors in the office and heard Record call African-American men "boy" in the 80's and early 90's.  Henry also claims that while working in the 28 degree room, Shelia Bagley talked rough to African-American employees, but admits that she did not use any racial terms.  He also claims that Bagley capped the number of people working for him at 19 but allowed Otis Green, another African-American supervisor, to have more workers. Henry claims that he has seen racial graffiti on the walls in the various bathrooms in the plant, but admits that it is painted over by the Defendants.

*Ophelia Loggins*

Ophelia Loggins is African-American and is a former employee of Defendant, ConAgra Poultry.  She was hired in 1974 and worked at the plant until 2002 when she was terminated. During her tenure at the plant, Loggins mostly worked in first processing.  At one time, Shelia Bagley, a Caucasian, was Loggins' supervisor.

Loggins claims that she was subjected to a hostile work environment while working at the plant.  In support of this allegation, she claims that her supervisor, Shelia Bagley, wasn't friendly and would look at her real mean and hateful.  However, Loggins admits that Bagley never said anything to her.  She also claims that the plant bathroom was filthy and in disrepair while the bathroom in the nurse's station was clean and in good working condition.  Loggins claims that there were bad words on the bathroom walls but could not recall if the words were racist or not. Loggins also states that Dossie Frazier told her that Ezekiel Ridgell, Frazier's brother, was being discriminated against in the maintenance department.  She also states that she heard talk that Granville Record would curse and yell at African-American employees.

18

*Nettie O'Gwin*

Nettie O'Gwin is African-American and is a former employee of Defendant, ConAgra Poultry. She was hired in 1972 and worked at the plant until 2003. During her tenure at the plant, O'Gwin worked on the drawing line and the trim line. At one time, Shelia Bagley, a Caucasian, was O'Gwin's supervisor.

O'Gwin claims that she was subjected to a hostile work environment while working at the plant. In support of this allegation, she claims that on two or three occasions in 2001, her supervisor, Shelia Bagley, told her to get back to work and would not let her sit down and rest her leg even though O'Gwin told her she was sick. She also claims that there were times that Bagley would not let her take a break while on the line. O'Gwin claims that the plant bathroom was filthy and in disrepair while the bathroom in the personnel office was clean. She does not claim to have seen any racial graffiti on the bathroom walls. O'Gwin claims that she heard talk that Granville Record yelled at African-American employees but never saw it because she didn't work in that area.

*Curtis Ridgell*

Curtis Ridgell is African-American and is a current employee of Defendant Pilgrim's Pride. C. Ridgell was hired in 1982 as a live chicken hanger. In 2002, he became a forklift driver on the back dock.

C. Ridgell claims to have subjected to a hostile work environment at the plant. In support of his claims, C. Ridgell claims that he has seen racial graffiti in the stalls in the plant bathroom, but admits that it is painted over by the Defendants. He also claims that the bathroom in his area

19

is so filthy that he uses the main bathroom in the plant.  C. Ridgell states that his brother, Zeke, told him that Fred McCormick, a Caucasian supervisor in the maintenance department, used racial slurs toward Zeke and cursed at him.  He also states that Zeke told him that Johnny Grove said the "n" word and "black boy" to Zeke on two different occasions.  C. Ridgell states that his sister told him that Shelia Bagley, her Caucasian supervisor, put more work on African-American employees than they could handle.  He states that somebody told him that Granville Record cursed and yelled at African-American employees and that Record threw a chicken at Willie White.  He also states  that somebody told him that Charlie Jackson grabbed Tasha Moore's arm and that Walter Cribb accused an African-American employee in the rendering department of stealing.

### Ezekiel Ridgell

Ezekiel Ridgell is African-American and is a current employee of Defendant Pilgrim's Pride.  E. Ridgell was hired in 1981.  In 1985, he transferred into the maintenance department for first processing where he presently works.  He is a member of the United Food and Commercial Workers, Local 2008.

E. Ridgell claims that he has been subjected to a hostile work environment while working at the plant.  The main focus of his allegation is his treatment by Fred McConnell, a Caucasian manager in first processing maintenance.[11]  E. Ridgell claims that from 1989-1996, McConnell directed racial slurs toward him and the other African-American employees on a daily basis.  He

---

[11] In Curtis Ridgell's deposition, he states that his brother Zeke told him that Fred McCormick, his Caucasian supervisor, was discriminating against him.  In Ezekiel Ridgell's deposition, he states that the man who discriminated against him was Fred McConnell.  The Court believes that Fred McCormick and Fred McConnell are one and the same person.

also claims that he would complain to the personnel office and file grievances about the treatment, but nothing was ever done to stop it.  E. Ridgell claims that because he complained of the treatment, McConnell retaliated against him by giving him dirty work to do.  He also claims that McConnell did not give him a raise for ten years.  In addition, E. Ridgell claims that in late 1998, Granville Record directed the "n" word toward him and two other African-American employees.  He claims that Walter Cribb called him a "spook" one time.  He claims that Jimmy Spark told racial jokes in front of him and that Teddy Goldman made racial remarks to him and once yelled at him.  Ridgell also claims that he saw Charlie Jackson grab Tasha Moore by the arm and jerk her around and that he has seen Granville Record, Russell Hendricks and Hank Craft yell at other African-Ameican employees.  He states that he heard talk about Granville Record throwing some chicken at Willie White.  He also claims that he has seen racial graffiti on the walls and above the urinals in the plant bathroom and on the stalls in the bathroom in first processing maintenance, but admits that it was painted over.

### Lisa Woodberry

Lisa Woodberry is a former employee of Defendant ConAgra Poultry Company.  She was employed from September 2002, until April 2003, when she was terminated.  During her tenure at the plant, Woodberry worked in the sanitation department.  During this time, she was supervised by John Hayes a Caucasian, and a man named Lou, an African-American.

Woodberry claims that she was subjected to a hostile work environment at the plant.  In support of her allegation, she claims that she didn't like the way her Caucasian supervisor, John Hayes, talked to her but admits that he never used a racial slur toward her.  She claims that she once heard Hayes call an African-American man "boy" but does not know who it was and admits

21

that he may have been calling the man "Taterboy."  Woodberry also states that she overheard

some people saying that Hayes once referred to another African-American man as a "crack

headed nigger."  However, Woodberry admits that she never heard Hayes use this word.

Woodberry claims that the plant bathroom was filthy and broken down, but also states that the

condition of the bathroom had nothing to do with her being an African-American.  Woodberry

states that she was told by Tasha Moore that Charlie Jackson, a Caucasian supervisor, grabbed

her by the arm.  She also states that she saw the bruise on Moore's arm.

<u>DISCUSSION</u>

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.  The

decision on whether to certify a class action is within the discretion of the district court.  *See*

*Coleman v. Watt,* 40 F.3d 255, 259 (8th Cir. 1994); *Morgan v. United Parcel Serv.,* 169 F.R.D.

349, 354 (E.D.Mo. 1996).  In determining whether to certify a class action, "the question is not

whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but

rather whether the requirements of Rule 23 are met."  *Eisen v. Carisle & Jacquelin,* 417 U.S.

156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)(citations omitted).  Thus, while the Court must

conduct a "rigorous analysis," *see Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161,

102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), class certification is a procedural determination and

should not include an inquiry into the merits of the plaintiff's claims.  *Eisen,* 417 U.S. at 177-78.

The plaintiff moving for class certification has the burden of showing that these requirements

under Rule 23 are met.  *Coleman v. Watt,* 40 F.3d at 259.

In order to be certified, the class must first satisfy the prerequisites set forth in Rule 23(a).

*Lang v. Kansas City Power & Light Co.,* 199 F.R.D. 640, 644 (W.D.Mo. 2001)(citations

omitted).  These requirements are met if:  1) the class is so numerous that joinder of all members

is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and

4) the representative parties will fairly and adequately protect the interests of the class.  These

prerequisites for class certifications under Rule 23(a) are commonly referred to as "numerosity,

commonality, typicality, and adequacy of representation."  *General Telephone Co. v. EEOC,* 446

U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

In addition to the requirements under Rule 23(a), the plaintiffs must show that the action

is maintainable under one of the following subdivisions of Rule 23(b):  1) that there is a risk of

inconsistent verdicts if the class is not certified; 2) that injunctive or declaratory relief is

appropriate; or 3) that a common question of law or fact predominates any questions affecting

only individual members and that a class action would be superior to other available methods.[12]

Fed.R.Civ.P. 23(b); *Clayborne v. Omaha Public Power Dist.,* 211 F.R.D. 573, 599 (D.Neb.

2002)(citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d

689 (1997)).

The Court will now consider each of the above requirements with respect to the

Plaintiffs' proposed class.

## Rule 23(a)

### *Numerosity*

The first requirement under Rule 23(a) is that the class must be "so numerous that joinder

---

[12] The Plaintiffs are seeking declaratory and injunctive relief, along with compensatory and punitive damages.  Therefore, they are seeking certification under both Rule 23(b)(2) and Rule 23(b)(3).

of all the members is impracticable." Fed.R.Civ.P. 23(a)(1).  Although the party moving for certification need not show the exact number of potential class members, the party does bear the burden of showing impracticability of joinder.   "Impracticable" does not mean that joinder must be impossible, but does require a showing that it would be extremely difficult or inconvenient to join all members of the class.  *Morgan,* 169 F.R.D. at 355 (citing *Gentry v. C & D Oil Co.,* 102 F.R.D. 449-, 493 (W.D.Ark. 1984)).

In this case, Plaintiffs contend that the numerosity requirement is met because the proposed class consists of hundreds of persons.  The Defendants argue that this number is speculative in that Plaintiffs base this number on a statement from a former employee who has not worked at the plant since 2001.  However, there is evidence that there are approximately 1,700 employees working at the Defendants' El Dorado plant at any given time and that seventy to eighty percent of these employees are African-American.  Given this large number of potential litigants, the Court believes that it would be reasonable to infer that a substantial number of these individuals would be includable in the class eligible for relief in this action and that joinder would be impracticable.  Therefore, the Court finds that the numerosity requirement under Rule 23(a) has been met in this case.

### Commonality

The second requirement under Rule 23(a) is that "there are questions of law or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  The commonality requirement does not require that every question of law or fact be common to every class member.  *Paxton v. Union Nat'l Bank,* 688 F.2d. 552, 561 (8th Cir. 1982)(citations omitted).  Rather, it may be satisfied "where the question of law linking the class members is substantially related to the resolution of the

litigation even though the individuals are not identically situated." *Id.* (quoting *American Finance Sys., Inc. v. Harlow,* 65 F.R.D. 94, 107 (D.Md. 1974).

Plaintiffs contend that their proposed class satisfies the commonality requirement because the issue of whether the Defendants fostered or tolerated a racial hostile work environment at its El Dorado plant is common to all of the class members.  In support of this contention, the Plaintiffs have put forth anecdotal evidence from African-American employees that described individual incidents of racial harassment, incidents of harassment that they observed, but that were not directed at them personally and incidents that they heard about from "talk" in the plant. They also described the presence of racial graffiti in the plant bathroom and the use of racial slurs and profanity by various Caucasian supervisors.[13]

In response, the Defendants content that commonality is not met because the question of whether a hostile environment exists is too individualized in that the Plaintiffs and members of the putative class work in different areas of the complex, in different departments within those areas, on different shifts and for different supervisors.  Each hostile work environment allegation made by these individuals differed depending on the area and department the individual worked and who their supervisor was.

In order to establish a claim for hostile work environment, it must be shown that 1) the employee is a member of a protected group; 2) the employee is subjected to unwelcome harassment; 3) a causal nexus exists between the employee's membership in the protected group and the harassment; 4) the harassment affected a term, condition, or privilege of their

---

[13] A detailed summary of the putative class members' deposition testimony is set forth in this Opinion's "BACKGROUND" section under the heading "The Proposed Class."

employment; and 5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Lang,* 199 F.R.D. at 647 (quoting *Mems v. City of St. Paul,* 224 F.3d 735, 738 (8th Cir. 2000)). This legal standard will apply to all members of the putative class, and as such, there is a common question of law guiding all the claims in this action. However, this alone is not sufficient to satisfy the commonality requirement. *Id., Elkins v. American Showa Inc.,* 219 F.R.D. 414, 424 (S.D.Ohio 2002). Plaintiffs must show that this common question of law is susceptible to common proof. *See Carlson v. C.H. Robinson Worldwide, Inc.,* 2005 WL 758602, *13-14 (D.Minn. March 31, 2005)(citing *Falcon,* 457 U.S. at 157-58). The Plaintiff must be able to bridge the gap between their individual claims of racially hostile working conditions and their claim that this environment is common to the class.

Here, each Plaintiff presented a vastly different account of the harassing conduct that constituted the alleged hostile work environment. Each allegation differed greatly as to frequency, severity and the nature of the conduct depending on the area they worked (the plant vs. the rendering department), the department they worked (second processing in the plant vs. processing and maintenance in the rendering department), and who their supervisors were (Shelia Bagley, Buddy Wesson, Kenneth Hall, Bill Devault, Walter Cribb or Randy Beaver). They also differed as to what they experienced within the same area or department and with the same supervisor. Therefore, whether an individual was subjected to a hostile work environment is dependent on the area and department that individual worked and the comments and actions taken by his or her individual supervisor. These claims can not be proven on a class-wide basis. They require different proof to establish liability. The Plaintiffs have failed to bridge the gap between their individualized hostile work environment claims and common questions of law

susceptible to common proof.  Therefore,  the Court finds that the commonality requirement

under Rule 23(a) has not been met in this case.

### *Typicality*

The third requirement under Rule 23(a) is that the claims or defenses of the representative

parties are typical of the claims or defenses of the class.  Fed.R.Civ.P. 23(a)(3).  This means that

the class representatives must be part of the class and possess the same interests and suffer the

same injuries as the class members.  *Falcon,* 457 U.S. at 156 (citations omitted).  To assess

typicality in a race discrimination suit, a court must determine whether a sufficient "community

of interests" exists to make plaintiff's claim typical of the class he or she seeks to represent.  To

make this assessment, the Court must compare 1) the plaintiff's employment situation and that of

the prospective class members; 2) the circumstances surrounding plaintiff's grievances and those

surrounding prospective class members' grievances; and 3) the relief sought by plaintiff and that

sought by the class.  *Clayborne v. Omaha Public Power Dist.,* 211 F.R.D. 573, 591 (D.Neb.

2002)(citing *Wakefield v. Monsanto Company,* 120 F.R.D. 112, 116 (E.D.Mo. 1988)).  "Factual

variations in the individual claims will not normally preclude class certification if the claim

arises from the same event or course of conduct as the class claims, and gives rise to the same

legal or remedial theory."  *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, the Plaintiffs' claims lack typicality because their claims do not arise from the same event

or course of conduct.

The Plaintiffs work in different areas or departments throughout the Defendants'

processing complex.  They have different supervisors.  Their claims arise out of differing events

and conduct within the particular departments in which they work.  As a result, their complaints

are highly individualized.  For instance, the complaints of Angela Goodwin who works as a knife sharpener in second processing are very different from the complaints of Eddie Gusby and Johnny Gill who work as maintenance men in the rendering department and the complaints of these class representatives are very different from the complaints of putative class member, Ezekiel Ridgell, who works as a maintenance man in first processing.  These differences preclude the Plaintiffs from adequately representing claims of class members who work outside their particular area or department and who have different supervisors.  *See Lang,* 199 F.R.D. at 654.  The class representatives' claims are not typical of the claims of the class.  Therefore, the Court finds that the typicality requirement under Rule 23(a) has not been met in this case.

    *Adequacy of Representation*

    The fourth requirement under Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the class.  Fed.R.Civ.P. 23(a)(4).  In determining adequacy of representation, the Court makes a two-fold inquiry to determine whether: 1) the class representatives have common interests with the members of the class, and 2) whether the class representatives will vigorously prosecute the interest of the class through qualified counsel.  *Wakefield,* 120 F.R.D. at 117 (E.D.Mo. 1988)(citing *Paxton,* 688 F.2d at 562).  Adequacy is tied to both commonality and typicality.  *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626, 117 S.Ct. 2231, 2251 (1997).

    In this case, the Plaintiffs have failed to show that their claims were common to and typical of the class.  Therefore, it has been determined that neither commonality nor typicality exists between the class representatives and the class they seek to represent.  Without these, it will be impossible for the Plaintiffs to adequately represent the interests of the class in this case.

Therefore, the Court finds that the adequacy of representation requirement under Rule 23(a) has not been met in this case.

The Plaintiffs have failed to show commonality, typicality and adequacy of representation in this case. As such, they have failed to satisfy all the requirements under Rule 23(a). This matter can not be certified as a class action. However, even if the Plaintiffs had satisfied these three requirements, this matter could not be certified as a class because as indicated below it does not qualify under Rule 23(b).

### Rule 23(b)

In addition to satisfying all the requirements of Rule 23(a), a plaintiff seeking class certification must also show that the proposed class qualifies under at least one of the subsections of Rule 23(b). *See Amchem,* 521 U.S. at 614, 117 S.Ct. 2231. Here, the Plaintiffs are seeking declaratory and injunctive relief, along with $100,000,000 in compensatory and punitive damages. Therefore, they are seeking certification under both Rule 23(b)(2) and Rule 23(b)(3).

Class certification under Rule 23(b)(2) can be maintained if "the party opposing the class acted or refused to act on grounds generally applicable to the class," making declaratory or injunctive relief appropriate. Fed.R.Civ.P. 23(b)(2). Class certification under this subsection is appropriate so long as the injunctive or declaratory relief is the predominate relief sought for the class. *Paxton,* 688 F.2d at 563. Here, the Plaintiffs are asking for injunctive and declaratory relief, as well as $100,000,000 in compensatory and punitive damages. However, even with a damage request, a class action under Rule 23(b)(2) may be maintained if the damages are merely incidental to a prayer for declaratory or injunctive relief. *Clayborne,* 211 F.R.D. at 599 (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 425 (5th Cir. 1998)). For damages to be

regarded as incidental  they must "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Id.* (quoting *Allison,* 151 F.3d at 415).  They are not assessed based upon the individual circumstances of the class representative's work history and personal injury; and they do not "require additional hearings to resolve the disparate merits of each individual's case." *Id.*

In this case, the Plaintiffs are seeking $100,000,000 in damages.  The Court believes that such a request is more properly viewed as one for monetary relief rather than for equitable non-monetary relief.  *See Skipper v. Giant Food Inc.,* 68 Fed.Appx. 393, 397 (4th Cir. 2003).  In addition, Plaintiffs are asking for at least $50,000,000 in compensatory damages "to overcome the particular effects of discrimination upon each named plaintiff and each class member."   Such damages will not flow directly from liability to the class as a whole.  Rather, the amount of damages each employee may be entitled to recover would require individual analysis of each class members' circumstances.  *See Clayborne,* 211 F.R.D. at 599.  These damages are not incidental to Plaintiffs' request for declaratory and injunctive relief.  Therefore, certification under Rule 23(b)(2) in not appropriate in this case.

Class certification under Rule 23(b)(3) can be maintained if "the questions of law or fact common to the members of the class predominate over questions affecting only individual members," and a "class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b)(3);  *Blades v. Monsanto Company,* 400 F.3d 562, 569 (8th Cir. 2005)(citing *Amchem,* 521 U.S. at 615).  The predominance portion of this rule parallels Rule 23(a)(2) in that both rules require that common questions exist.  However, even if Rule 23(a)(2)'s commonality requirement is satisfied ... the predominance criterion under

Rule 23(b)(3) is far more demanding. *Amchem,* 521 U.S. at 623-24. This part of the rule "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. To determine if a common question predominates over an individual question the Court looks to the nature of the evidence necessary to make out a prima facie case. *See Blades,* 400 F.3d at 566 (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136-40 (2nd Cir. 2001)). If the members of a proposed class need to present evidence that varies from member to member to make a prima facie showing on a given question, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it is a common question. *Id.*

In this case, the Plaintiffs claim that they have been subjected to a hostile work environment at the Defendants' processing complex. However, the evidence presented in support of this action reflects highly individualized claims of discriminatory conduct. Thus, the cause of harm here is not a single course of conduct which is identical to each purported class member. These highly individualized claims will require the proposed class to present evidence that varies from member to member on how that particular member was discriminated against and how it affected him individually. The Court will then have to look at each members' individual circumstances to determine if the alleged harassment unreasonably interfered, both objectively and subjectively, with that members' working conditions. Thus, the Defendants' liability to an individual member for damages, and a determination of the amount of damages owed, will depend on that members' particular circumstances and is subject to any defenses the Defendants may have against that member. As such, the questions of law and fact common to the class are not predominate in this case.

The superiority portion of Rule 23(b)(3) requires that a class action be the superior method for adjudicating the claims before it.  Here, the Plaintiffs' claims and those of the proposed class members vary greatly.  The circumstance of a particular members' claim depends on the area, department and shift they work and who their co-workers and supervisors are. Questions affecting individual class members, such as how they were discriminated against and how it affected them individually, will require the Court to conduct a series of mini-trials to determine both liability and damages for each class member.  Therefore, any economy that would be achieved by class treatment is lost.  As such, a class action is not the superior method for adjudicating the Plaintiffs' or the proposed class members' alleged discrimination claims against the Defendants. Therefore, certification under Rule 23(b)(3) in not appropriate in this case.

<u>CONCLUSION</u>

The Plaintiffs have failed to demonstrate that they meet the requirements of Rule 23 and that class certification is appropriate in this case.  Therefore, the Plaintiffs' Motion for Class Certification is hereby **denied**.  The Court notes that this decision does not preclude the named Plaintiffs from going forward with their own individual claims or, the members of the putative class from filing lawsuits to advance their own individual claims.   It only affects the appropriate model for the adjudication of these claims.  An order of even date, consistent with this Opinion, will be entered.

IT IS SO ORDERED, this 15th day of May, 2007.


  /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge

32